*In re* TIMOTHY HESS' WILL.

MARY FOSTER *et al. vs.* ELLA DEARBORN *et al.*

Argued Nov. 9, 1891. Decided March 7, 1892.

**Wills—Evidence of Undue Influence.**—The exercise of undue influence over a testator must be proved by affirmative evidence, apart from his declarations or admissions, which are only pertinent to show the effect of such influence upon his mind.

**Same—Effect—To be Shown.**—It is not enough that there be motive and opportunity, but the influence must be exercised and take effect so as to destroy the free agency of the testator, and control the disposition of the property, when the will is made.

**Same—What is Insufficient.**—The provisions of the will, and the fact that the beneficiaries therein, who are specially favored, have opportunities,

by reason of social or domestic relations, or other causes, to influence the testator, may be considered, in connection with other testimony, in trying the question of undue. influence; but such facts, standing alone, are not evidence of such influence.

**Same—Conditions and Circumstances.**— So, also, the condition of the testator's mind and health, and his peculiar and mental characteristics, may also enter into the consideration of the case.

**Evidence Insufficient.**—*Held*, upon a review and consideration of all the evidence in this case, that the findings of the jury upon the questions of fraud and undue influence are not supported.

Appeal by Ella Dearborn and James Hess, proponents of the will of Timothy Hess, deceased, from an order of the district court of Winona county, *Start*, J., made January 23, 1891, refusing a new trial in the matter of the probate of the will.

Timothy Hess, deceased, made his will September 24, 1888, at the house of Theodore Searl, a justice of the peace, at Witoka, in Winona county, Minn. Mr. Hess and Ella Dearborn, his daughter, came to Mr. Searl's house at about eleven o'clock in the forenoon, and stayed until three o'clock in the afternoon. The daughter stated that her father had come to have Mr. Searl draw his will, and told, in his presence, how he wanted to dispose of his property. The testator was seventy-three years old, and had no wife, but had five children, viz. Mary Geeslin, Emma Tate, Cornelius Hess, Ella Dearborn, and James Hess. It appears, also, that Mrs. Dearborn had a son, George G. Ford, by a former husband. She lived in Chicago, Ill., and was then on a visit to her father. Mrs. Geeslin was divorced from her first husband, and afterwards married Mr. Foster, and lived at Baraboo, Wis. Mrs. Tate's husband died, and she afterwards married Mr. Ryan. Cornelius was married, and lived at or near Spokane Falls, Wash.

The testator told Mr. Searl, when he was about to draw the will, that he wished to give Mary but $50. Mr. Searl testified that he expressed surprise that the amount was so small, whereupon Mrs. Dearborn said that her brother James wanted Mary to have but five dollars,—just enough so she could not break the will. He also testified that Mr. Hess did not say much, was not talkative, but ap-

peared like a man that was hardly satisfied with what he was doing; that, when the amount was mentioned which Cornelius was to have, Mrs. Dearborn said that Cornelius' wife was keeping a ranch of bad repute near Spokane Falls. The testator appeared like a man that was doing something that he seemed to think necessary, and that had got to be done, but did not seem to like to do it. After it was completed he said it might not amount to anything. He seemed to be studious and very thoughtful. He did not appear to be satisfied with what he was doing. Searl further testified that when Hess came to his house he told Searl he had come to have his will drawn. Searl asked him how he wanted it drawn, and he told him, and it was discussed more or less as he was drawing it. Hess told what each bequest should be. Mrs. Dearborn said her father did not want Mary to have any more, because she would give it to her husband, Mr. Geeslin, and he would squander it. Searl further said: "She did not dictate the will to me. I drew it as he dictated it. He was decided. He did not want it changed from the way he had arranged it in his mind. Mrs. Dearborn said in the conversation that her sister Emma's conduct was such that she had no right to the property, and that Mr. Geeslin had made boasts that he would have a good time on Mr. Hess' money. The testator said but very little. He was generally quite a sociable man. He was competent and knew what he was about all the time. I did not believe the statements that Mrs. Dearborn made about her sister, and her brother's wife, and do not know whether the testator believed them or not."

Mrs. Searl and Mrs. Dearborn, the other persons present when the will was drawn, testified substantially to the same effect.

Mr. Hess died in December, 1889, and the will was presented in the probate court for Winona county, and admitted to probate on March 8, 1890. The contestants appealed to the district court, and a trial was had in September, 1890. The court submitted to the jury two questions, viz.:

*First.* Was the alleged will of Timothy Hess procured to be made by the undue influence of Ella Dearborn and James Hess, or either of them?

*Second.* Was the alleged will of Timothy Hess procured to be made by the fraud or deceit of Ella Dearborn and James Hess, or either of them?

Each of these questions was answered by the jury in the affirmative. The proponents moved the court to set this verdict aside and grant a new trial on the ground that it was not justified by the evidence and was contrary to law. The motion was denied, and they appealed.

*Lloyd Barber*, for proponents.

There is no evidence in the case that reasonably tends to show that the will was procured by the undue influence or fraud of Ella Dearborn and James Hess, or either of them.

The testator had a right, in disposing of his property by will, to use his own judgment and consult his own preferences, without regard to how such disposition might be approved or disapproved by others. *Storer's Will*, 28 Minn. 9; *Mitchell* v. *Mitchell*, 43 Minn. 73.

To set this will aside, the contestants must show that in making it the testator acted against his will; that his free agency was destroyed at the time he made the will; that he was not left to act intelligently, understandingly, and voluntarily, but was controlled by the will or purpose of another. *Nelson's Will*, 39 Minn. 204; *Mitchell* v. *Mitchell*, 43 Minn. 73.

To avoid the will, the influence must overcome and control the mind of the testator, at the time the will is made, and there must be affirmative evidence of the facts from which such influence is to be inferred. *Nelson's Will*, 39 Minn. 204; *Gardiner* v. *Gardiner*, 34 N. Y. 155; *Cudney* v. *Cudney*, 68 N. Y. 148; *Children's Aid Soc. of New York* v. *Loveridge*, 70 N. Y. 387; *Miller* v. *Miller*, 3 Serg. & R. 267; *Tawney* v. *Long*, 76 Pa. 106, 115; *Rabb* v. *Graham*, 43 Ind. 12; Schouler, Wills, § 232.

And there can be no fatally undue influence without a person incapable of protecting himself, as well as a wrongdoer to be resisted. *Latham* v. *Udell*, 38 Mich. 238.

The declarations or statements of the testator, made more than eleven months after the execution of his will, were not admissible in evidence for any purpose, on any issue in the case. *Storer's Will,*

28 Minn. 9; *Rusling* v. *Rusling*, 36 N. J. Eq. 607; *Boylan* v. *Meeker*, 28 N. J. Law 282; *Kitchell* v. *Beach*, 35 N. J. Eq. 454; *Cudney* v. *Cudney*, 68 N. Y. 148; *Horn* v. *Pullman*, 72 N. Y. 277; *Shailer* v. *Bumstead*, 99 Mass. 112, 122; *Bush* v. *Bush*, 87 Mo. 486; *Richardson* v. *Richardson*, 35 Vt. 238; *Harring* v. *Allen*, 25 Mich. 505; *Stevens* v.*Vancleve*, 4 Wash. C. C. 265; *Comstock* v. *Hadlyme Ecc. Soc.*, 8 Conn. 254; *Runkle* v. *Gates*, 11 Ind. 98; *Herster* v. *Herster*, 122 Pa. St. 239.

*Keyes & Brown*, for contestants.

The reasons why the order of the court below, denying a new trial of this action, should be affirmed, may be brought to the attention of the court by a hasty review of the evidence, and in particular the evidence of the witnesses Mr. and Mrs. Searl.

The disposition of the testator's property appears to have been agreed upon and arranged by him and Mrs. Dearborn before they came to the house of witness Searl to have the will drawn. Mrs. Dearborn was present, with the testator and two witnesses, and seemed to control it, and it seemed to be just as she said it was going to be. The testator appeared like a man that was hardly satisfied with what he was doing; it was not satisfactory to him,—what he was doing. He appeared like a man that was doing something that he seemed to think necessary and that had got to be done, and did not seem to like to do it,—something that he thought he was obliged to do. The testator appeared dissatisfied with what he was doing, and the way he was doing it. He was restless, and more than usually silent.

It was Mrs. Dearborn, not the testator, who made the slanderous statements regarding contestants, and gave reasons why the will should be drawn so and so, and caused her brother and sisters to be cut off with only enough so they could not break the will. The will seemed to be drawn just as previously arranged, and according to her will. These circumstances, coupled with the fact that more than half of the estate was willed to Mrs. Dearborn and her son, George Ford, and practically all of it to herself and James, can mean but one thing, and that is that this interest taken by Mrs. Dearborn was to see that her prearranged plan was carried out. Mrs. Searl says,

"It appeared as if it was all understood before they came over." The extreme difficulty of proving the facts of undue influence and fraud in a case like this, and the impossibility of witnesses fully reproducing before the court and jury what they saw and heard, allow us to maintain that there is in the testimony the most substantial kind of evidence of undue influence and fraud.

The rule for determining the sufficiency of evidence to support the findings of a jury upon controverted questions of fact, applied to verdicts in civil actions of a purely legal nature, applies also to all verdicts upon specific questions of fact tried by a jury under the direction of the court, whether in actions of equitable cognizance only, or in actions transferred to and tried in a district court on appeal from a probate court. *Marvin* v. *Dutcher*, 26 Minn. 391.

What constitutes undue influence, within the meaning of the law, is stated in *Nelson's Will Case*, 39 Minn. 204; *Mitchell* v. *Mitchell*, 43 Minn. 73; and the only question in the case is, what does the evidence reasonably tend to prove? We contend that it not only tends to, but substantially does prove: *First*. External facts of fraud and undue influence practiced and exercised by Ella Dearborn and James Hess in procuring the will in question to be made. *Second*. The effect of such external facts of fraud and undue influence upon the mind of the testator at the time he executed the alleged will, and thereafter until his death.

The difference is certainly very obvious between receiving the declarations of a testator to prove a distinct fact, such as duress or fraud, for instance, and as evidence merely of the mental condition of the testator. In the former case it is merely hearsay, and liable to all the objections to which the mere declarations of third persons are subject; while in the latter it is direct and appropriate evidence. Questions of undue influence belong, in this respect, to the latter class. The principal fact to be established is the mental condition of the testator at the time of making his will, and for this purpose evidence of his declarations, previously and subsequently, bears directly on the question, and must be relevant and competent. For this purpose this evidence is direct and primary. *Waterman* v. *Whitny*, 11 N. Y. 157; *Storer's Will*, 28 Minn. 9; *Shailer* v. *Bumstead*,

99 Mass. 112; *Potter* v. *Baldwin*, 133 Mass. 427; *Cudney* v. *Cudney*, 68 N. Y. 148; *Middleditch* v. *Williams*, 45 N. J. Eq. 726; *Herster* v. *Herster*, 122 Pa. 239.

VANDERBURGH, J.   Timothy Hess, late of Winona county, died testate, in December, 1889, leaving, him surviving, five children, James Hess, Mrs. Ella Dearborn, Mrs. Mary Foster, Mrs. Emma Ryan, and Cornelius Hess.   He was upwards of 70 years old.   His will was executed September 24, 1888.   In this will James Hess and Mrs. Ella Dearborn were named executors, and legacies of $50 each, only, were left to Mrs. Foster, Mrs. Ryan, and Cornelius Hess, a legacy of $500 to George Ford, a son of Mrs. Dearborn, and all the rest and residue of the estate of the deceased was given and devised to the executors, James Hess and Mrs. Dearborn, share and share alike. The estimated value of the estate was about $5,000.   The validity of this will is contested by Mrs. Foster and Mrs. Ryan and Cornelius Hess, who alleged that the same was procured to be executed through the fraud of James Hess and Mrs. Dearborn, and constraint and undue influence by them executed and exercised over the mind of the testator at the time of the execution thereof.   On appeal from the order and judgment of the probate court, the issue of fraud and undue influence was tried by jury in the district court of Winona county, and a verdict thereon rendered in favor of the contestants.

One of the principal assignments of error is that the findings and verdict of the jury are not justified by the evidence.   It is contended by the proponents that there was no evidence of fraud or undue influence in the case warranting the submission of the question to the jury.   It is not necessary, in considering this assignment of error, to review the evidence *in extenso*, or to make special reference to the testimony of the several witnesses.   It will be sufficient to refer to such parts of it as may be necessary to show the basis of our conclusions upon this question.   What is and is not undue influence has been considered and declared in our former decisions, and we need do little more than refer to them here.   *In re Storer's Will*, 28 Minn. 11, (8 N. W. Rep. 827;) *Nelson's Will*, 39 Minn. 205–208, (39 N. W. Rep. 143;) *Mitchell* v. *Mitchell*, 43 Minn. 73, (44 N. W. Rep. 885.) It is said in *Re Storer's Will*: "From the nature of the case, the ev-

idence of undue influence will be mainly circumstantial. It is not usually exercised openly, in the presence of others, so that it can be directly proved. But the circumstances relied on to show it must be such as, taken altogether, point unmistakably to the fact that the mind of the testator was subjected to that of some other person, so that the will is that of the latter, and not of the former." But the burden of proof rests upon the contestants to establish the existence of fraud or undue influence; and that, we are obliged to hold, after a very careful and thorough consideration of the evidence in this case, they failed to do.

Evidence was received on the trial of the declarations of the testator subsequent to the execution of the will, for the purpose of showing the extent and effect of the undue influence claimed to have been exercised over him when the will was made; but the court correctly charged the jury that if the evidence, independent and exclusive of the testator's declarations, did not satisfy them that undue influence was used in procuring the making of the will, they must answer the question of undue influence in the negative. And this must, of course, be so; otherwise the fact would be permitted to be proved by such declarations, though not part of the *res gestæ*. The evidence of undue influence must be other than that which proceeds from the testator's own mouth after a will is made. And in this case the evidence fails to show, apart from such declarations, that there had been either such pressing solicitations or fraudulent practices on the part of the proponents as to amount to moral coercion of the testator, not only affecting his judgment, but overriding his free agency, also. Indeed, with the exception of the testimony of the witnesses to the will of what transpired at the time it was drawn and executed, there is no evidence of any importance on the main issue. It is not enough that there be motive and opportunity, as the evidence undoubtedly tends to show there were in this case, but the influence must be exercised and take effect so as to destroy the free agency of the testator, and control the disposition of the property under the will when it is made. Unless the influence of these beneficiaries was unfairly and unlawfully executed, so as to dominate his will at the time, it is not material that they were interested in the will, or had

better opportunities for solicitation or persuasion than the contestants. Nor is it surprising that a testator should favor those who are nearest to him in respect and affection, or by reason of intimate social or domestic relations. The influences growing out of such causes must be allowed to have their natural and legitimate effect upon the mind of the testator, so that, if he chooses to make unwise and apparently unjust discrimination among those who are the natural objects of his bounty, he is at liberty to do so; for, when he comes to make his will, he is entitled to distribute his property as he pleases, provided, only, that, in the exercise of this right, his mind is under no such constraint or moral coercion as to interfere with his free agency. *Mitchell* v. *Mitchell*, 43 Minn. 73, (44 N. W. Rep. 885.) The principal actors in this contest are Mrs. Dearborn and Mrs. Foster, who is the chief contestant. The record shows, we think, quite clearly, that the testator was previously dissatisfied with the conduct and social relations of Mrs. Ryan and Mrs. Foster. And though he had not forgotten that Mrs. Foster had, years before, rendered him valuable service in his household after the decease of his wife, yet he was displeased at her marriage, and feared and believed that any property which she might receive would be squandered. And we gather from the record sufficient evidence, we think, to warrant the belief that there were grounds for such dissatisfaction on the part of the testator.

As respects the specific charge of fraud growing out of the alleged representations of Mrs. Dearborn, we dismiss it by saying that it is not sustained by the evidence; nor does the record present a much stronger case of undue influence. The testator had made it his home with his son James, on the farm of the latter, in Winona county, for several years before his death. Mrs. Dearborn lived in Chicago. A few days before the will was executed Mrs. Dearborn came on a visit to her father, and remained till after its execution, when her father went with her to Chicago, but afterwards returned to Minnesota, and, before his death, visited Mrs. Foster in Wisconsin. As respects James, the evidence shows that he brought his father and sister to the magistrate when the will was made. His father also left with him the key to his box in a safety vault,

where the testator had deposited it before he went to Chicago. A witness also testifies that Mrs. Dearborn said, in presence of the magistrate and her father, that James did not want the contestants to be allowed any more than a nominal sum each, in the will; "just enough to prevent breaking the will." There is no other evidence connecting him with the will. But Mrs. Dearborn was present when the will was made, and talked with other persons present, including the testator, about its provisions. The testator was of sound mind, and unquestionably competent to make a will, and a man of resolute and determined purpose. Searl (who drew the will) and his wife were the principal witnesses in the case. Searl swears that Mrs. Dearborn said, when they came in, that her father had come to have a will made, and she came to tell him how they wanted it made, or how their father wanted it made. Then he says the testator said he "wanted to make his will, and told him how he wanted it made." Searl was greatly surprised at the inequality of the bequests in the will, and so expressed himself. This led to more or less conversation, particularly in respect to further provision for Mrs. Foster. It seems that the testator was not very communicative, but said, in substance, in reference to Mrs. Foster, that he would like to give her more, but her husband would squander it. The witness stated that the testator was not satisfied, and was uneasy and restless; but it distinctly appears that after all the suggestions were made, and notwithstanding all that was said, he firmly adhered to his purpose to make his will as he had at first indicated. The witness Searl states, on his cross-examination: "Mrs. Dearborn did not dictate the will to me. I drew the will as he dictated it. *Question.* And drew it just as he told you, I suppose? *Answer.* Yes, sir. *Q.* Now, then, you state that Mr. Hess appeared to be thoughtful, very silent, peculiar in his manner, do you? *A.* I did not see anything peculiar about him at that time. I may have expressed it in that way. I don't remember. *Q.* Do you now state, that when you were talking over the will, he was decided in making it as he dictated it? *A.* Yes, sir; he was decided. *Q.* That the will should be as he dictated? *A.* Yes, sir; he did not want it changed, as he had arranged it in his mind."

So that it is quite apparent that the testator was not influenced to change the nature of the bequests or the frame of the will by anything that occurred at the office of the magistrate where it was drawn and executed.   It was already "arranged in his mind."   And there is nothing to show either that in forming his purpose, or in adhering to it, he was unduly influenced, or that the instrument was not his will, as he understood and declared it to be.   The witness further states that, "after it was completed, he said it might not amount to anything."   He knew that he could alter it afterwards if. he desired to do so, and he was advised by some of the witnesses to do so, but did not.   He visited his daughter, Mrs. Foster, during the summer before he died, and it appears that she understood that he had made his will, and knew that she was not favored, and she endeavored afterwards to induce him to change it, but could not prevail on him to do so.

The more closely the case is examined, in the light of all the testimony, the more clearly it appears that there is no sufficient proof of facts from which undue influence can be inferred.   The testator was a man of strongly marked characteristics, of sound mind and determined will, abundantly able to protect himself,—a matter not to be overlooked in considering a case of this kind; and, as long as the law permits a disposition of property by will different from that which the statute makes in case of intestacy, the mere fact that the testator makes an unequal, partial, or seemingly unjust division of his property is no ground for setting it aside.   The provisions of the will may be considered, in connection with other evidence, in trying the question of undue influence, but is not itself evidence of such influence; and the court cannot assume to judge of the justice of the provisions of the will, or to question the motives of the testator in making it.   *Cudney* v. *Cudney*, 68 N. Y. 152; *Nelson's Will*, 39 Minn. 205, (39 N. W. Rep. 143;) *Latham* v. *Udell*, 38 Mich. 238.

Order reversed.

(Opinion published 51 N. W. Rep. 614.)